YOST *v.* GRAND TRUNK RAILWAY CO.

MASTER AND SERVANT — PERSONAL INJURIES — HAZARDOUS EM-
PLOYMENT.

.Plaintiff applied for clerical employment at the office of de-
fendant railway company and was put at work indexing
cars. From the first he was required, as a part of his duties,
to check each freight car as it went out of the yard. In per-
forming his work, which was subsequently changed to day
work, plaintiff climbed on the side of a car and was brushed
off and injured by another car which the train passed. *Held,*
that his duties were from the first those of a car checker and
he was not changed to a hazardous employment that he did
not engage to perform.

Error to Wayne; Hosmer, J. Submitted June 7, 1911.
(Docket No. 16.) Decided September 29, 1911.

Case by Harry Yost, by his next friend, against the
Grand Trunk Railway Company for personal injuries.
A judgment for defendant on a verdict directed by the
court is reviewed by plaintiff on writ of error. Affirmed.

*Milligan & Milligan,* for appellant.

*Harrison Geer,* for appellee.

MOORE, J. The plaintiff, while checking cars, was
brushed from the side of a freight train and lost a portion
of his hand. He sued to recover damages. From a
directed verdict in favor of defendant, the case is brought
here by writ of error.

We quote from the brief of counsel:

" The right of recovery for the injury was based princi-
pally on these grounds: That the minor plaintiff's em-
ployment was changed from a safe one to an extra hazard-
ous one; that the minor plaintiff, by reason of the negli-
gent orders of his superior, was exposed to danger not in
his line of employment, and while carrying out the orders
of his superior, and without being properly and sufficiently
instructed in his work, met with his injuries; that the fel-

low-servant doctrine was inapplicable; but, even admitting it to enter into the case, that the negligence of the defendant's agents in placing and leaving the cars on the side track, not in clear of the main line in the yards, was the negligence of the defendant, under the proofs. * * * This disposes of assignment of error No. 6, which we first discussed because appellant considers it the real pivotal point upon which the case turned."

Assignment No. 6 reads as follows:

" (6) The court erred in charging the jury as follows:

" ' I do not think that the testimony which has been given by the plaintiff would warrant the inference that there was a change of employment. He was brought to Mr. Graham, and Mr. Graham set him to work.' "

When plaintiff entered the employ of defendant he was 19 years and 8 months old. He carried a letter to Mr. Graham. His testimony discloses that Mr. Graham was the yard clerk and had charge of the car checkers; that plaintiff desired clerical work, and commenced work under Mr. Graham about half past 4 o'clock in the afternoon about the middle of July, indexing cars.

"I had started to work at half past 4 in the afternoon, and somewheres around the vicinity of 12 o'clock at night Mr. Graham had a conversation with me in reference to doing other kinds of work. He told me at that time that I would have to go out and let that work lie there; that I would have to go out and start to check the cars. I did not know what that was, and I had not agreed to work at that kind of work. * * * When Mr. Graham put me out that night into the yards, I told him that I understood that I was to work at just what I was doing, and that I had no experience or knew nothing of the outside work. He said, 'Come out anyway, and I will show you.' He says: 'You will learn; it won't take long.' * * * I remember the case of *Sarah Yost* v. *Grand Trunk Railway Company*, which was tried before Justice De Gaw the 3d of December, 1909. I was a witness in that case.

"*Q.* I will ask you if this question was asked you and you answered it as follows:

" 'Q. What conversation did you have with Mr. Graham—what did you say you wanted to do?

" 'A. I told Mr. Graham the line of work I had been doing, clerking. He said he thought I would do first-rate.'

" A. Yes, sir.

"Q. Now listen to this question. That question was asked you, and you answered it in that manner.

" 'Q. What did he say in regard to having sufficient work inside for a few weeks?

" 'A. He told me he would set me checking at night—at night until work got heavy, and then I could help him during the day in the office.'

" Did you so testify?

"A. Yes, sir. * * *

"Q. Now, I will ask you if this question was asked you, and if you so testified?

" 'Q. Mr. Graham employed you as a car checker?

" 'A. He employed me—did not say what it was; he did not say it was a car checker or what it was. He employed me. Then he started me car checking.'

"Q. Did you so testify?

"A. I don't remember.

"Q. If so, was it true?

"A. Yes, it is correct—parts of it. All of it is correct under the circumstances. He started me at clerical work, and then he told me he would start me as a car checker at 11 o'clock. That was the same day I started work. I resisted and told him I was not hired for that kind of work, and he said to come on out and 'I will show you,' and I went out. Mr. Graham showed me how to do the work and stayed there with me until about 1 o'clock in the morning, and the next night Mr. Graham stayed with me also, and also the next night. Mr. Wickford stayed with me the fourth night. I do not remember who stayed with me the fifth and sixth nights. I checked cars the first night I went to work there and every night while I was employed at night work. * * * When I had any spare time I would index cars, which consisted of getting the numbers of them as they came into the yard and putting them into a book with blue ink, and when they go out check them out in red ink, designating what cars were in the yard and what were not. I had to keep a record in the office of the cars coming in and going out of the yard. * * *

"*Q.* Now, as a matter of fact, is not the way the thing occurred there at the time you were employed, Mr. Graham told you, didn't he, he would have the office work and you would have to check cars?

"*A.* He told me that it would not last long. He told me to go out. He said it would not last long, and he said he could use me entirely in the office.

"*Q.* Later?

"*A.* Well, he used me there before and then after he said he would do it.

"*Q.* He told you for the time being you would have to check cars, that he did not have work in the office for you?

"*A.* He did not say exactly I would have to do it.

"*Q.* If you worked for him?

"*A.* Yes, if I worked for him. * * * I did take the job without any complaint, but I complained about it after—at that time I took it without any complaint.

"*Q.* When he put you to work you did not complain at all at first?

"*A.* No, sir; until—the same day there.

"*Q.* And he put you to work checking cars, didn't he?

"*A.* Yes, sir.

"*Q.* And he showed you what the work of checking cars is, didn't he?

"*A.* Yes, sir.

"*Q.* And he spent a week at it, didn't he?

"*A.* Yes, sir."

It is impossible to read all of the testimony of the plaintiff without reaching the conclusion that, while he sought a clerical position, he in fact was given one that, from the first day of his employment, required him to check cars; that from the night of his employment until about the 1st of August he was a night car checker, and from then until the day of the accident that he was a day car checker. This fact—that is, that there was no change of employment—established by plaintiff's own testimony when read as an entirety disposes of the case.

Judgment is affirmed.

OSTRANDER, C. J., and BIRD, McALVAY, and BROOKE, JJ., concurred.